## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | Case No. 10-44193-MSH |
| DANIEL J. MITCHELL AND SANDRA | ) | |
| L. MITCHELL | ) | |
| | ) | |
| Debtors | ) | |
| | ) | |
| DANIEL J. MITCHELL AND SANDRA | ) | |
| L. MITCHELL | ) | |
| | ) | Adversary Proceeding |
| Plaintiffs | ) | No. 10-04118 |
| | ) | |
| v. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A. | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Wells Fargo Bank, N.A., the defendant in this adversary proceeding, seeks summary judgment on each of the four counts in the complaint filed by the plaintiff-debtors, Daniel and Sandra Mitchell.

## I. Jurisdiction

Preliminarily, it is necessary to consider the scope of bankruptcy court jurisdiction in this proceeding in which the Mitchells assert claims against Wells Fargo for monetary damages and equitable relief on theories of estoppel, lack of power to foreclose and violation of state consumer protection law. In its original and amended answers to the Mitchells' complaint, Wells Fargo stated that it did not consent to the entry of final judgment by this court. Bankruptcy

1

judges may enter final orders or judgments in "all core proceedings arising under title 11, or

arising in a case under title 11." 28 U.S.C. § 157(b)(1). Non-core proceedings that are "related to

a case under title 11" may be heard by the bankruptcy judge and, unless the parties consent to

entry of "appropriate orders and judgments," the bankruptcy judge "shall submit proposed

findings of fact and conclusions of law to the district court." *Id.* at § 157(c).

The United States Court of Appeals for the First Circuit has succinctly elucidated the terms

"arising under," "arising in," and "related to" as follows:

> The "arising under" language of § 1334(b) is analogous to the "arising under"
> language in 28 U.S.C. § 1331. 1 *Collier on Bankruptcy, supra,* ¶ 3.01[4][c][i], at
> 3-21. In shorthand, it is commonly said that "arising under" proceedings are (at
> least) those cases in which the cause of action is created by title 11. *Id.; see also*
> *Cont'l Nat'l Bank of Miami v. Sanchez* ( *In re Toledo* ), 170 F.3d 1340, 1345 (11th
> Cir.1999); *In re Wood,* 825 F.2d at 96.

> "Arising in" proceedings generally "are those that are not based on any right
> expressly created by title 11, but nevertheless, would have no existence outside of
> the bankruptcy." *In re Wood,* 825 F.2d at 97; *see also In re Toledo,* 170 F.3d at
> 1345; *United States Tr. v. Gryphon at Stone Mansion, Inc.,* 166 F.3d 552, 556 (3d
> Cir.1999); *Eastport Assocs. v. City of Los Angeles* ( *In re Eastport Assocs.*), 935
> F.2d 1071, 1076 (9th Cir.1991).

> By contrast, this court has defined "related to" proceedings as proceedings
> which "'potentially have some effect on the bankruptcy estate, such as altering
> debtor's rights, liabilities, options, or freedom of action, or otherwise have an
> impact upon the handling and administration of the bankrupt estate.'" *In re G.S.F.*
> *Corp.,* 938 F.2d 1467, 1475 (1st Cir.1991) (quoting *Smith v. Commercial Banking*
> *Corp.* ( *In re Smith*), 866 F.2d 576, 580 (3d Cir.1989)).

*In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 68 (1st Cir. 2002).

The claims raised by the Mitchells in their complaint are not created by title 11 but rather

are grounded in state law (precluding "arising under" jurisdiction) and do not lack independent

existence outside of bankruptcy (precluding "arising in" jurisdiction). The asserted claims are,

however, "related to" the Mitchells' case under title 11. The primary relief sought by the

Mitchells is the recovery of their residence. Thus, "[a] decision for the bank will end the debtors'

claim to the property. A decision for the debtors will restore their rights in the property so that they

may be able to recover it and deal with the secured debt in their Chapter 13 plan." *In re York*, 291

B.R. 806, 808-09 (Bankr. E.D. Tenn. 2003) (concluding that the bankruptcy court had related-to

jurisdiction over a plaintiff's claim to set aside a prepetition foreclosure sale).

Therefore, as a non-core proceeding in which Wells Fargo does not consent to the

bankruptcy court's issuing a final order, my decision in this matter will be submitted to the district

court as proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1) and

Fed. R. Bankr. P. 9033.

## II. Proposed Findings of Fact

The following facts are drawn primarily from the affidavits, exhibits and testimony of the

parties. Apart from general denials or averments of lack of knowledge in its answer to the

Mitchells' complaint and responses to interrogatories, Wells Fargo has not offered a version of

the facts which differs materially from the Mitchells'.

On April 24, 2007, Mr. and Ms. Mitchell purchased property located at 279 Saunders

Street in Gardner, Massachusetts.[1]  They financed the purchase through a loan of $210,400

obtained from Superior Mortgage Corp.[2]  To secure their loan obligation to Superior Mortgage

Corp. the Mitchells granted a mortgage on the Gardner property to Mortgage Electronic Systems,

---

[1]  Complaint, Docket No. 1, p. 2, ¶ 6; Amended Answer, Docket No. 69, p. 2, ¶ 6.

[2]  I take judicial notice of the mortgage as recorded in the Worcester District Registry of Deeds at
Book 41036, Page 374. *See McKenna v. Wells Fargo Bank, N.A.*, 2011 WL 1100160, at *1 n.6
(D. Mass. Mar. 21, 2011).

Inc. ("MERS") as nominee for Superior Mortgage Corp., its successors and assigns.[3] The

Mitchells claim that on June 15, 2007 the beneficial rights in their loan were transferred by

Superior Mortgage Corp. to Federal Home Loan Mortgage Corporation ("Freddie Mac").[4]

Approximately two years later, on July 29, 2009, Andrew S. Harmon, acting as Assistant

Secretary and Vice President of MERS pursuant to a MERS corporate resolution dated October

31, 2001, executed a document assigning the Mitchells' mortgage to Wells Fargo Bank, N.A.[5]

That same day, Wells Fargo filed a complaint in Massachusetts Land Court under the

Servicemembers Civil Relief Act, a prerequisite to foreclosure of the mortgage.[6]

By letter from Wells Fargo dated December 8, 2009, the Mitchells received notice that

their mortgage was in default for non-payment of twelve installments, from January 1, 2009

through December 1, 2009.[7]

---

[3] *Id.*

[4] Statement of Facts in Dispute, Docket No. 79, p. 1-2, ¶ 2. This claim is supported by two exhibits attached to the Mitchells' statement of material facts in dispute. The first exhibit is a Form 1099-A, which identifies Freddie Mac as the lender on August 20, 2010, the date of the foreclosure sale. The second exhibit is a "mortgage milestone sheet," supplied by MERS in response to a document production request, which lists the transfer of the beneficial interest in the Mitchells' mortgage from Superior to Freddie Mac.

[5] I take judicial notice of the assignment of mortgage as included in the plaintiffs' Exhibit Book, Docket No. 14, p. 14 and filed with the Worcester District Registry of Deeds at Book 44673, Page 284.

[6] I take judicial notice of the document filed with the Land Court, a Department of the Trial Court of the Commonwealth of Massachusetts, which notified the Mitchells that Wells Fargo had filed its complaint. This notification was included in the plaintiffs' Exhibit Book, Docket No. 14, p. 63 and is recorded with the Worcester District Registry of Deeds at Book 45240, Page 132.

[7] Exhibit Book, Docket No. 14, p. 18. The Mitchells incorporated into each of their affidavits certain facts from the Preliminary Injunction Memorandum, Docket No. 13, and certain documents from an Exhibit Book, Docket No. 14.

On December 1, 2009, prior to receiving the notice of default, Ms. Mitchell contacted a Wells Fargo representative to inquire about a possible loan modification,[8] at which time she was told that she and her husband were "pre-qualified" under the Home Affordable Modification Program ("HAMP") and that a payment of between $3,500 and $4,000 would enable Wells Fargo to refer the Mitchells' loan to Wells Fargo's loss mitigation department.[9] Ms. Mitchell responded that she could not afford to make the payment.[10]

The Mitchells received a letter from Harmon Law Offices, P.C. ("Harmon") dated December 14, 2009, notifying them that Wells Fargo intended to foreclose the mortgage on their property.[11] Ms. Mitchell called Wells Fargo on at least two occasions to request that the foreclosure sale be postponed.[12] Wells Fargo postponed the foreclosure sale twice, once in January 2010 and again in July 2010.[13] Ms. Mitchell states in her affidavit that the foreclosure postponements were based on Wells Fargo's decision, communicated to her via telephone, to approve the Mitchells for a 90-day trial loan modification.[14] Ms. Mitchell further states that

---

[8] Preliminary Injunction Memorandum, Docket No. 13, p. 3, ¶ 3 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[9] *Id.* as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[10] *Id.* at p. 3, ¶ 5 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[11] *Id.* at p. 4, ¶ 8; Exhibit Book, Docket No. 14, p. 21. Each was incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[12] Preliminary Injunction Memorandum, Docket No. 13, p. 4, ¶ 9 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[13] Complaint, Docket No. 1, p. 3, ¶ 15; Amended Answer, Docket No. 69, p. 3, ¶ 15.

[14] Complaint, Docket No. 1, p. 3, ¶ 13; Preliminary Injunction Memorandum, Docket No. 13, p. 4, ¶ 9 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

Wells Fargo instructed her to pay $1,219.51 by the first of each month.[15]  Wells Fargo admits

that the Mitchells "entered a loss mitigation program pursuant to which certain payments were

made to the Defendant."[16]

In June 2010, Wells Fargo advised Ms. Mitchell that her loan modification request had

been denied because she had failed to submit monthly updated financial documents as

requested.[17]  Ms. Mitchell states in her affidavit that she never received such a request for

documents from Wells Fargo.[18]

Prior to the July 20, 2010 postponed foreclosure date, Wells Fargo sent the Mitchells a

letter, dated July 5, 2010, requesting certain financial documents and re-initiating the loan

modification process.[19]  In a letter dated July 15, 2010, Wells Fargo notified Ms. Mitchell that

the bank was unable to reach a "mutual agreement regarding the options available to assist [Ms.

Mitchell] with [her] current situation."[20]  In a second letter dated July 15, 2010, addressed only

to Ms. Mitchell, Wells Fargo outlined the alternative loss mitigation options available, along

with a financial worksheet for the Mitchells' review.[21]  Finally, several days after July 20, 2010,

---

[15]  Preliminary Injunction Memorandum, Docket No. 13, p. 4, ¶ 9 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[16]  Amended Answer, Docket No. 69, p. 3, ¶ 13.

[17]  Preliminary Injunction Memorandum, Docket No. 13, p. 5, ¶ 12 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[18]  *Id.* as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[19]  Exhibit Book, Docket No. 14, p. 43 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[20]  *Id.* at p. 55 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[21]  *Id.* at p. 56-59 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

Mr. Mitchell received a letter from Harmon notifying him that the foreclosure sale had been

postponed, yet again, from July 20, 2010 to August 20, 2010.[22]  Wells Fargo requested additional

documents by letter dated July 28, 2010, again addressed only to Ms. Mitchell.[23]  Included in the

list of documents requested were a hardship letter, bank statements, and pay stubs.[24]  On August

13, 2010, Wells Fargo sent Ms. Mitchell an escrow disclosure statement and notice of new

mortgage payment with an October 1, 2010 effective date.[25]  Ms. Mitchell further avers in her

affidavit that by telephone call on August 14, 2010, Wells Fargo informed her that a new

representative had taken over the Mitchells' file and that additional documents were required.[26]

Mr. Mitchell faxed Wells Fargo the requested documents on August 16, 2010 and was informed

---

[22]  Preliminary Injunction Memorandum, Docket No. 13, p. 7, ¶ 21 as incorporated into Mr.
Mitchell's Affidavit, Docket No. 79.

[23]  Exhibit Book, Docket No. 14, p. 61-62 as incorporated into Ms. Mitchell's Affidavit, Docket
No. 79.

[24]  *Id.* as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

[25]  Preliminary Injunction Memorandum, Docket No. 13, p. 8, ¶ 27 as incorporated into Ms.
Mitchell's Affidavit, Docket No. 79. The escrow disclosure statement and notice of new
mortgage payment is a one-page document which includes the following paragraph:

> Each year Wells Fargo Home Mortgage reviews your escrow account to
> determine if the current monthly payment amounts are sufficient to cover your
> projected property taxes and/or insurance premiums. Increases or decreases in
> your annual tax and/or insurance amounts may cause your monthly mortgage
> payments to change. Your monthly mortgage payment may also change if your
> loan totals include an adjustable rate feature or buydown assistances.

Exhibit Book, Docket No. 14, p. 72 as incorporated into Ms. Mitchell's Affidavit, Docket
No. 79. As reflected on the statement, the current monthly payment, including principal
and/or interest and escrow was $1,330.14 while the new monthly payment would be
$1,308.37.

[26]  Preliminary Injunction Memorandum, Docket No. 13, p. 8, ¶ 28 as incorporated into Ms.
Mitchell's Affidavit, Docket No. 79.

by telephone, on August 17, 2010, that all requested information had been received but that an updated financial worksheet and hardship letter were still needed.[27]  Mr. Mitchell states in his affidavit that he faxed the requested documents that same day.[28]  On August 18, 2010, Mr. Mitchell called Wells Fargo and was informed that all new documents had been received, their file was complete, and no other information was needed.[29]  Mr. Mitchell further states in his affidavit that he called Wells Fargo several times on August 19th and August 20th and was informed that no decision had been made regarding the Mitchells' loan modification request or the pending August 20, 2010 foreclosure sale.[30]

On August 20, 2010, Wells Fargo conducted a foreclosure sale of the Mitchells' property and emerged as the high bidder.[31]  The Mitchells state in their affidavits that on August 26, 2010 they received a letter dated August 16, 2010 notifying them that their request for a loan modification had been denied.[32]

---

[27] *Id.* at p. 8, ¶ 30 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79. It is unclear whether the still-needed hardship letter was in addition to one allegedly faxed by Mr. Mitchell on August 16, 2010.

[28] *Id.* as incorporated into Mr. Mitchell's Affidavit, Docket No. 79.

[29] *Id.* at p. 9, ¶ 32 as incorporated into Mr. Mitchell's Affidavit, Docket No. 79.

[30] *Id.* at p. 9, ¶ 34 as incorporated into Mr. Mitchell's Affidavit, Docket No. 79.

[31] Attached as an exhibit to Wells Fargo's statement of undisputed material facts is a copy of the August 20, 2010 memorandum of sale in connection with the foreclosure sale.

[32] Preliminary Injunction Memorandum, Docket No. 13, p. 9, ¶ 35 as incorporated into Ms. Mitchell's Affidavit, Docket No. 79.

### III. Procedural History

On August 24, 2010, four days after the foreclosure sale, the Mitchells filed a voluntary

petition under chapter 13 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*),

commencing the main case. That same day, they filed their four-count complaint instituting this

adversary proceeding. The counts are titled: I) estoppel; II) lack of power to foreclose; III) unfair

and deceptive acts or practices; and IV) attorneys' fees.

Concurrently, the Mitchells filed an emergency motion for a temporary restraining order

seeking to prevent Wells Fargo from further alienating their home. On August 26, 2010, after a

hearing on the emergency motion, I issued a temporary restraining order. The Mitchells

thereafter sought to continue the temporary restraining order as a preliminary injunction. The

parties stipulated to a continuing injunction.[33]

On January 31, 2011, Wells Fargo filed a motion for summary judgment as to all four

counts of the Mitchells' complaint. Thereafter, the Mitchells filed a Rule 56(d) motion, pursuant

to Fed. R. Civ. P. 56(d), made applicable by Fed. R. Bankr. P. 7056, seeking to conduct

discovery before responding to Wells Fargo's motion for summary judgment. The motion was

granted as to specific discovery requests only.[34]  The Mitchells filed their opposition to Wells

Fargo's motion for summary judgment following the permitted discovery period under Rule

---

[33]  In addition to the injunction, the stipulation reflected Wells Fargo's consent to the entry of a
lis pendens on the Gardner property upon separate motion of the Mitchells. Such a motion was
made and allowed.

[34]  The order dated, March 10, 2011, instructed Wells Fargo to provide the Mitchells with an
amended response to document production requests and an amended or supplemental response to
interrogatories. The parties were also given additional time to complete any further discovery as
to the relationship between Wells Fargo and Freddie Mac.

56(d) and included a statement of disputed material facts. After a hearing on the motion for

summary judgment, I took the matter under advisement.

## IV. Discussion

### A.  Proper Treatment of the Motion for Summary Judgment

In their opposition to Wells Fargo's motion for summary judgment, the Mitchells contend

that based on Wells Fargo's assertion of alleged deficiencies in their complaint, the motion for

summary judgment is "the functional equivalent" of a motion to dismiss under Rule 12(b)(6) of

the Federal Rules of Civil Procedure and should be treated as such. The Mitchells submit that

even though Wells Fargo does not rely *solely* on the complaint in bringing its motion for

summary judgment, Wells Fargo's substantive legal arguments are centered on the sufficiency of

the claims asserted in the complaint.

When the record before the court on a motion for summary judgment is limited to the

pleadings, a summary judgment motion is the functional equivalent of a motion to dismiss. *N.

Ark. Med. Ctr. v. Barrett*, 962 F.2d 780, 784 (8th Cir. 1992) (citing *Blum v. Morgan Guar. Trust

Co.*, 709 F.2d 1463, 1466 (11th Cir. 1983)). However, when the parties file exhibits and

affidavits that go beyond the "limited universe" of documents which may be considered in a

motion to dismiss, a motion for summary judgment is the proper course of action. *See Nat'l

Family Ins. Co. v. Exch. Nat'l Bank of Chi.*, 474 F2d 237, 239 (7th Cir. 1973) (concluding that

when each party "filed numerous exhibits, affidavits, counter-affidavits, depositions and

memoranda in support of and in opposition to the motion to dismiss," the motion to dismiss was

properly treated as a motion for summary judgment). This limited universe consists of the

complaint, answer, documents attached to the complaint, referenced in the complaint, or central

to the claims in the complaint, the authenticity of which are not challenged, and relevant public

records. *See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001).

The Mitchells submitted affidavits and exhibits for consideration with respect to both their motion for a preliminary injunction and their opposition to Wells Fargo's motion for summary judgment and have thereby expanded the relevant pleadings well beyond the complaint. The affidavits in particular, which attest to communications the Mitchells assert occurred between themselves and Wells Fargo's representatives, are beyond the limited universe of materials that may be considered in a motion to dismiss. These affidavits exceed the scope of the pleadings and may be considered only in the context of a motion for summary judgment.

Additionally, the timing of Wells Fargo's motion is an important consideration in determining whether it is more properly treated as a motion to dismiss. When a motion for summary judgment is filed on the heels of the complaint, at a time when the only available resource for evaluating plaintiff's claims is the complaint, the motion is premature and should be considered under a Rule 12(b)(6) standard. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (indicating that summary judgment is appropriate after "adequate time for discovery"). If, however, there has been sufficient time to develop the record, then a motion for summary judgment is appropriate. *See, e.g.*, *Jordan v. Ryan*, 2010 WL 1541588, at *2 (D. Ariz. Apr. 19, 2010) ("In light of the virtually non-existent evidentiary record, summary judgment at this stage would be premature.").

Wells Fargo filed its summary judgment motion more than five months after the Mitchells filed their complaint. Following the filing of Wells Fargo's motion for summary judgment, the Mitchells filed a Rule 56(d) motion in which they sought either the dismissal of

11

Wells Fargo's motion for summary judgment or time to conduct further discovery before responding to the motion. I granted the Rule 56(d) motion in part, instructing Wells Fargo to respond to the Mitchells' document production request and interrogatories. Nearly two months after the order granting the Rule 56(d) motion, the Mitchells filed their opposition to Wells Fargo's motion for summary judgment. During the seven and a half months between the filing of the motion for summary judgment and the hearing thereon, the Mitchells had sufficient time to supplement the record with facts and to draw to the attention of the court and Wells Fargo those facts they believed to be in dispute.

Finally, Wells Fargo does not argue that the Mitchells have failed in their complaint to state a claim; rather, Wells Fargo alleges that the Mitchells are unable to support their claims with any facts thus far presented.

Wells Fargo's motion is consistent with the purpose behind summary judgment and Rule 56(f). Therefore, I recommend that Wells Fargo's motion be treated as it is denominated—a motion for summary judgment.

## B.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056. A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve in favor of the nonmoving party. *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 427 (1st Cir. 1996)). "Material" means that a disputed fact has "the potential to change the outcome of the suit" under the governing law

12

if the dispute is resolved in favor of the nonmovant. *McCarthy v. Nw. Airlines, Inc.* 56 F.3d 313, 314-15 (1st Cir. 1995).

Wells Fargo bears the initial responsibility to inform the court of the basis for its motion and to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as in this case, the Mitchells have the burden of proof on the underlying complaint, Wells Fargo need do no more than aver an absence of factual support for the Mitchells' case. The burden of production then shifts to the Mitchells, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both "genuine" and "material." *Desmond v. Varrasso*, 37 F.3d 760, 763 n.1 (1st Cir. 1994) (citations omitted).

## C.  Count I--Estoppel

### 1.  Claims to Be Considered

The Mitchells seek to rely on count I of their complaint not only for its stated claim of estoppel, but also as a springboard for two related but unpled claims and causes of action: (1) that their trial period plan with Wells Fargo was itself an enforceable contract subject to the implied duty of good faith and fair dealing, and (2) that they are third-party beneficiaries of a contract between Wells Fargo and a government-sponsored entitiy.

While Fed. R. Civ. P. 15(b), made applicable to this proceeding by Fed. R. Bankr. P. 7015(b), permits, under certain circumstances, a complaint to be amended as a case proceeds,[35]

---

[35]  It is an "open question whether the Federal Rules permit parties to impliedly consent to 'try' issues not raised in their pleadings through summary judgment motions." *Indep. Petroleum Ass'n of Am. V. Babbitt*, 235 F.3d 588, 596 (D.C. Cir. 2001). While the U.S. Court of Appeals for the

there are plain and pragmatic reasons for limiting this practice. The Court of Appeals for the

First Circuit in *Rodriguez v. Doral Mortgage Corporation* set forth the framework for analyzing

muddled claims brought by a plaintiff:

> The bottom line is simply this: while courts should construe pleadings
> generously, paying more attention to substance than to form, they must always
> exhibit awareness of the defendant's inalienable right to know in advance the
> nature of the cause of action being asserted against him.
>
> …
>
> . . . Under the Civil Rules, notice of a claim is a defendant's entitlement, not a
> defendant's burden. The truth-seeking function of our adversarial system of
> justice is disserved when the boundaries of a suit remain ill-defined and litigants
> are exposed to the vicissitudes of trial by ambush.
>
> At a bare minimum, even in this age of notice pleading, a defendant must
> be afforded both adequate notice of any claims asserted against him and a
> meaningful opportunity to mount a defense.

57 F.3d 1168, 1171-72 (1st Cir. 1995). Defendants cannot be expected to "forage in forests of

facts, searching at their peril for every legal theory that a court may some day find lurking in the

penumbra of the record." *Id.* at 1172.

Accordingly, in fairness to Wells Fargo, I recommend invoking Rule 15(b) to permit the

Mitchells' complaint to be deemed amended only with respect to claims that Wells Fargo had

"adequate notice of" and to which Wells Fargo had "a meaningful opportunity to mount a

defense." *Id.* The application of these considerations to the initially unpled claims relating to

---

First Circuit has not ruled on this issue, I am persuaded by the reasoning of circuits which have
concluded that Rule 15(b) applies at the summary judgment stage. Summary judgment has the
potential to result in a final judgment and should be treated with the same gravitas as a final
order at trial. *See McCree v. Se. Pa. Transp. Auth.*, 2009 WL 166660, at *9 (E.D. Pa. Jan. 22,
2009) (collecting cases); *see also Parker v. Bos. Univ. (In re Parker)*, 334 B.R. 529 (Bankr. D.
Mass. 2005) (Hillman, J.) (invoking Rule 15(b) "to amend the pleadings *sua sponte* to conform
to the arguments of the parties").

breach of good faith and fair dealing and to third-party beneficiary status will be discussed

below.

### 2.  Estoppel

In count I of their complaint, the Mitchells plead the general theory of "estoppel,"

praying that "the August 20, 2010 foreclosure sale be set aside and that Wells Fargo be enjoined

from continuing to attempt to foreclose until it had fairly considered and acted upon the

Plaintiffs' requests for loss mitigation."[36]  The Mitchells opposed Wells Fargo's motion for

summary judgment by filing a two-part opposition: the first part treating the motion as a motion

to dismiss and the second part treating the motion as one for summary judgment. In presenting

their position under the motion to dismiss standard, the Mitchells argued that the facts set forth in

their complaint supported a claim not only with respect to a traditional theory of promissory

estoppel involving an express promise, but also with respect to promissory estoppel based on an

implied promise. In the same section the Mitchells also asserted a theory of equitable estoppel.

The Mitchells failed, however, to include any reference to their estoppel claim—promissory or

equitable—in the section of their opposition under the summary judgment standard. Wells Fargo,

in replying to the Mitchells' opposition to its motion for summary judgment, did not address the

estoppel claims embedded in the Mitchells' motion to dismiss argument.

It is unnecessary to engage in a protracted analysis of which estoppel claims the Mitchells

will be permitted to assert for the simple reason that the undisputed facts in the record show that

they cannot establish a fundamental prerequisite to any estoppel claim—reasonable and

---

[36] "Setting aside" and "enjoining" are not generally the consequences of an estoppel claim. It appears that the Mitchells are seeking to estop Wells Fargo from relying on its memorandum of sale for purposes such as alienating the Mitchells' home.

detrimental reliance.

Under Massachusetts law,[37]

> [c]ircumstances that may give rise to an estoppel are (1) a representation intended
> to induce reliance on the part of a person to whom the representation is made; (2)
> an act or omission by that person in reasonable reliance on the representation; and
> (3) detriment as a consequence of the act or omission.

*Sullivan v. Chief Justice for Admin. and Mgmt. of Trial Ct.*, 448 Mass. 15, 27-28, 858 N.E.2d

699, 711-12 (Mass. 2006). Massachusetts courts note "a difference between a claim for equitable

estoppel and one for promissory estoppel. '[U]nder a theory of equitable estoppel, there must be

reliance on a misrepresentation of past or present facts, while a theory of promissory estoppel

permits reliance on a misrepresentation of future intent.'" *Id.* at 711 n.9 (modification in

original). Regardless of whether a plaintiff pleads promissory or equitable estoppel, without a

showing of reasonable and detrimental reliance by the plaintiff a claim of estoppel cannot

survive summary judgment.

The Mitchells' argument appears to be that Wells Fargo made numerous representations

regarding the status of their loan modification and repeatedly postponed pending foreclosure

sales in reliance upon which the Mitchells refrained from seeking bankruptcy protection prior to

---

[37] "When facing a claim that does not arise under the Constitution or the laws of the United States,
a federal court must apply the substantive law of the forum in which it sits, including the state's
conflict-of-laws provisions." *Telford v. Iron World Mfg., LLC*, 680 F. Supp.2d 337, 338 (D. Mass.
2010) (quoting *Dykes v. DePuy, Inc.*, 140 F.3d 31, 39 (1st Cir. 1998)). Moreover,

> [w]ith regard to both torts and contracts cases, the Massachusetts Supreme Judicial
> Court has adopted a functional choice-of-law approach that seeks to respond to the
> interests of the parties, the states involved, and the interstate system as a whole. . . .
> In general, Massachusetts law requires the court to apply the substantive law of the
> state with the most significant relationship to the transaction or occurrence and to
> the parties.

*Telford*, F. Supp.2d at 338. Neither party contends that a state other than Massachusetts has
a significant relationship to the transaction or occurrence and to the parties.

the August 20, 2010 foreclosure sale, thereby losing their home when the sale was not postponed.

*Black's Law Dictionary* defines "reliance" as "[d]ependence or trust by a person, esp. when combined with action based on that dependence or trust." (8th ed., p. 1316). Thus, the Mitchells must have acted in *dependence* on Wells Fargo's representations in order to satisfy the reliance element of estoppel. This was, in fact, not the case here. The Mitchells' estoppel claim breaks down at the point that they allege the bank's promises and/or representations induced them to refrain from filing for bankruptcy.[38]  In response to her attorney's questions at the hearing on the motion for a preliminary injunction, Ms. Mitchell testified to the contrary:

Q      Now did you consult a bankruptcy attorney at all prior to August 20th?

A      We did not.

Q      Why not?

A      We didn't realize we had that right. Maybe I live under a rock and don't realize, really, what's going on around me, but I believed that you could only file bankruptcy if you had a lot of credit card debt, which we do not. I didn't believe we could save our house. I didn't believe we could file bankruptcy. I didn't think it was an option for us, so we did not.

Ms. Mitchell has made no showing that she would have acted any differently in the absence of the alleged promises and misrepresentations or that she suffered any detriment resulting from an

---

[38]  Although the Mitchells allege in their complaint that "[t]he Plaintiffs refrained from commencing a bankruptcy case to head off the foreclosure sale because they believed Wells Fargo would grant them relief that would make bankruptcy unnecessary[,]" the complaint has not been verified and I cannot rely on unverified allegations at this summary judgment stage. *Kelly v. United States*, 924 F.2d 355, 359 (1st Cir. 1991) (citing Rule 56(e)).

act or omission in reliance upon an alleged promise or representation by Wells Fargo. Mr.

Mitchell, too, has presented no evidence beyond the unverified complaint that he would have

filed for bankruptcy absent the alleged statements and actions by Wells Fargo's representatives.

Without a basis for finding reasonable and detrimental reliance, the Mitchells' claim for

estoppel, whether promissory or equitable, fails.

### 3.  Trial Period Plan as an Independent Contract

One of the two claims not pled in their complaint, but subsequently raised by the

Mitchells as part of count I, is that the trial period plan they entered into with Wells Fargo was

itself an enforceable contract that carried with it the implied duty of good faith and fair dealing

under Massachusetts law. The Mitchells raised this claim first by inserting relevant legal support

on the last page of their Rule 56(d) motion, and second by raising a claim for breach of contract

in the motion to dismiss portion of their opposition to Wells Fargo's motion for summary

judgment. In none of the other filed pleadings in this case have the Mitchells repeated this

argument. At no point did Wells Fargo respond to this claim.

In accordance with the standard set forth by the First Circuit in *Rodriguez*, 57 F.3d at

1172, Wells Fargo cannot be exposed to each and every sundry argument set forth by the

Mitchells in their pleadings and can only be subjected to claims which are clearly set forth and to

which Wells Fargo had a meaningful opportunity to respond. I find that Wells Fargo lacked

sufficient opportunity to respond to this claim when it was not set forth clearly in the Mitchells'

complaint and was raised only superficially by them on the last page of their Rule 56(d) motion

and in the motion to dismiss section (but not in the summary judgment section) of their

opposition to Wells Fargo's motion for summary judgment. I therefore recommend that the

18

complaint be deemed not amended to incorporate the unpled trial period plan as an independent

contract claim.

However, in the motion to dismiss section of the Mitchells' opposition to Wells Fargo's

motion for summary judgment, the Mitchells request that they be given the opportunity to

formally amend their complaint pursuant to Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its

pleading only with the opposing party's written consent or the court's leave. The court should

freely give leave when justice so requires."). The framework for determining when to grant leave

to amend is as follows:

> Courts should "freely give leave [to amend] when justice so requires," but
> leave to amend is not granted automatically. Leave to amend should be "freely
> given" if "the underlying facts or circumstances relied upon by a plaintiff may be a
> proper subject of relief." Even so, courts may deny leave to amend if there is an
> apparent or declared reason for doing so, such as "undue delay, bad faith or dilatory
> motive on the part of the movant, repeated failure to cure deficiencies by
> amendments previously allowed, undue prejudice to the opposing party by virtue of
> allowance of the amendment or futility of amendment."
>
> In deciding whether or not to grant leave to amend, the court can also
> consider the burden that granting [] leave to amend would place on the judicial
> system.

*J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co.*, 265 F.R.D. 341, 346 (N.D.

Ind. 2010) (internal citations omitted).

I recommend that the Mitchells' request for leave to amend be considered after

giving Wells Fargo an opportunity to respond to the Mitchells' request.

### 4.  The Mitchells as Third-Party Beneficiaries

The other unpled claim of the Mitchells derived from count I of their complaint is one for

breach of contract based on a third-party beneficiary theory. In the early stages of this adversary

proceeding, the Mitchells raised the argument that Wells Fargo breached its duty to fairly

consider their request for a loan modification. This argument was premised upon the Mitchells'

assertion of third-party beneficiary status under an agreement between Wells Fargo and a

government-sponsored entity (to which the Mitchells are not signatories) pursuant to which

Wells Fargo agreed, among other things, to perform mortgage loan modifications. The Mitchells

argued their third party beneficiary status again in the opposition to Wells Fargo's motion for

summary judgment in the following manner:

> The Plaintiffs penned their argument concerning third-party beneficiary status
> prior to this court's decision in *Cruz v. Hacienda Assocs., LLC (In re Cruz)*, 446
> B.R. 1 (Bankr. D. Mass. 2011).[39]  Because there is no binding precedent
> concerning this issue, the Plaintiffs restate their argument in order to preserve it
> for possible appeal.[40]

In Wells Fargo's reply to the Mitchells' opposition to its motion for summary judgment, Wells

Fargo identified the Mitchells' claim for relief as third-party beneficiaries and engaged in a

lengthy rebuttal of the Mitchells' assertion. Based on this response from Wells Fargo, I

recommend finding it appropriate, pursuant to Fed. R. Civ. P. 15(b), to consider the Mitchells'

complaint amended to add a claim for breach of contract under a third-party beneficiary theory.

### a.   The Nature of Third-Party Beneficiary Claims

### i.   Historical Context

The Federal National Mortgage Association ("Fannie Mae") was born in the wake of the

Great Depression when Congress identified the need for a secondary mortgage market and

---

[39]  The plaintiff in *In re Cruz* asserted a breach of contract claim premised on third-party
beneficiary status. In denying the plaintiff's emergency motion for a preliminary injunction, I
concluded that "the plaintiff is not a third party beneficiary of Wells Fargo's [Servicer
Participation Agreement] or other relevant HAMP servicing agreements and . . . is not likely to
succeed on Count I of the complaint." 446 B.R. at 4.

[40]  Mitchells' Opposition to Wells Fargo's Motion for Summary Judgment, Docket No. 78, p. 15.

created Fannie Mae to fill that role.[41]  Initially, Fannie Mae was authorized by the federal

government to purchase only Federal Housing Administration (FHA)-insured mortgage loans

from independent banks.[42]  Banks could originate FHA-insured loans, sell them to Fannie Mae,

and use the funds received to originate more loans.[43]  By engineering a secondary mortgage

market the government sought to make the dream of home ownership achievable for more

Americans.[44]

       In 1968 Congress enacted legislation amending Fannie Mae's government charter to

make it a private entity.[45]  In 1970 Congress authorized Fannie Mae to purchase conventional as

well as FHA loans and also created Freddie Mac to spur competition in the secondary mortgage

market.[46]  In the early 1980s, with the advent of mortgage securitization, Fannie Mae and

Freddie Mac, as government-sponsored entities ("GSEs"), "began to bundle and sell mortgages

as a new security product for sale to investors as mortgage-backed securities ('MBSs'). . . .

---

[41]  *See* Federal Housing Finance Agent, *History of the Government Sponsored Entities*,
http://www.fhfaoig.gov/LearnMore/History (last visited July 19, 2012) [hereinafter FHFA,
*History*]

[42]  *See id.*

[43]  *Id.*

[44]  CONG. BUDGET OFFICE, FANNIE MAE, FREDDIE MAC, AND THE FEDERAL ROLE IN THE
SECONDARY MORTGAGE MARKET ix (2010), *available at* http://www.cbo.gov/sites
/default/files/cbofiles/ftpdocs/120xx/doc12032/12-23-fanniefreddie.pdf (last visited July 19,
2012) [hereinafter CONG. BUDGET OFFICE Report] .

[45]  U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-09-782, FANNIE MAE AND FREDDIE MAC:
ANALYSIS OF OPTIONS FOR REVISING THE HOUSING ENTERPRISES' LONG-TERM STRUCTURES 13
(2009), *available at* http://www.gao.gov/assets/300/295025.pdf (last visited July 19, 2012).

[46]  FHFA, *History*, *supra* note 41.

Eventually, one out of every seven home mortgages made in the U.S. was channeled through

Fannie Mae" and either held in Fannie Mae's long-term portfolio or bundled into an MBS.[47]

  Fannie and Freddie held a distinct advantage over private investment banks. They had a

direct line of credit with the U.S. Treasury and were exempt from state and local corporate

income taxes.[48]  But perhaps most importantly, it was presumed by the investing community that

mortgage-backed securities issued by Fannie and Freddie bore the implicit guarantee of the

federal government.[49]

  In the mid-1990s when sub-prime mortgage lending became the next big thing and

private investors began aggressively purchasing loans of any size, interest rate, and quality,

Fannie and Freddie, in order to maintain their market position, joined in the feeding frenzy.[50]

---

[47]  STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 111TH CONG., REP. ON FRIENDS OF
ANGELO: COUNTRYWIDE'S SYSTEMATIC AND SUCCESSFUL EFFORTS TO BUY INFLUENCE AND
BLOCK REFORM 10 (Comm. Print), *available at* http://oversight.house.gov/wp-content/uploads
/2012/02/20090319FriendsofAngelo.pdf (last visited July 19, 2012); *see also* Paul A. Argenti,
*Fannie Mae*, prepared for Goldman Sachs and The Executive Leadership Council & Foundation,
2003, *available at* http://mba.tuck.dartmouth.edu/pdf/2003-1-0070.pdf (last visited July 19,
2012).

[48]  CONG. BUDGE OFFICE Report, *supra* note 44, at viii.

[49]  *Id.* at vii.

> [Fannie Mae and Freddie Mac] purchase mortgages that meet certain standards
> from banks and other originators, pool those loans into mortgage-backed
> securities that they guarantee against losses from defaults on the underlying
> mortgages, and sell the securities to investors—a process referred to as
> securitization. In addition, they buy mortgages and MBSs (both each other's and
> those issued by private companies) to hold in their portfolios. They fund those
> portfolio holdings by issuing debt obligations, known as agency securities, which
> are sold to investors.

*Id.*

[50]  Ben S. Bernanke, Chairman, Fed. Reserve, Address at the Federal Reserve Bank of Chicago's

When housing prices began to decline in 2007 and it became clear that the loans underlying

mortgage-backed securities were worth nowhere near their face values, Fannie and Freddie

nearly collapsed.[51]  As expected, in 2008 the federal government stepped in and put the GSEs

into conservatorship, where they remain today.[52]  Fannie and Freddie continue to purchase

mortgage loans from originating banks while permitting those banks to act as servicers for the

loans.[53]

### ii.  Statutory, Regulatory, and Contractual Framework

The economic collapse of 2007 led to the financial crisis of 2008. The government

takeover of Fannie and Freddie, the bankruptcy of Lehman Brothers and the near failure of

American International Group, Inc. (AIG) paralyzed the country's banking system.[54]  In

---

43rd Annual Conference on Bank Structure and Competition (May 17, 2007), *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20070517a.htm (last visited June 28, 2012); Mark A. Calabria, *Fannie, Freddie, and the Subprime Mortgage Market*, CATO Institute, Mar. 7, 2011, Briefing Paper no. 120, p. 1, 5, *available at* http://www.cato.org/pubs/bp /bp120.pdf (last visited July 19, 2012).

[51]  FHFA, *History*, *supra* note 41.

[52]  *See* N. ERIC WEISS, CONG. RESEARCH SERV., RL34661, FANNIE MAE'S AND FREDDIE MAC'S FINANCIAL PROBLEMS 14-16 (2012), *available at* http://www.fas.org/sgp/crs/misc/RL34661.pdf (last visited July 19, 2012).

[53]  *See* Fannie Mae, *Marketplace Liquidity*, http://www.fanniemae.com/portal/funding-the-market/marketplace-liquidity.html? (last visited June 28, 2012); *see also* Fannie Mae Single Family Selling Guide, *available at* https://www.efanniemae.com/sf/guides/ssg/sg/pdf/ sel062612.pdf (last visited June 28, 2012); Fannie Mae Single Family 2012 Servicing Guide, *available at* https://www.efanniemae.com/sf/guides/ssg/svcg/svc031412.pdf (last visited June 28, 2012) [hereinafter Fannie Mae Servicing Guide].

[54]  *See* BAIRD WEBEL, CONG. RESEARCH SERV., RS22950, TROUBLED ASSET RELIEF PROGRAM (TARP): IMPLEMENTATION AND STATUS Summary (2012), *available at* http://www.fas.org/ sgp/crs/misc/R41427.pdf (last visited July 19, 2012).

response, Congress enacted the Emergency Economic Stabilization Act of 2008.[55]  The

centerpiece of the Act was its implementation of the Troubled Asset Relief Program ("TARP").[56]

TARP was the vehicle by which the Secretary of the Treasury was authorized by Congress to

inject up to $700 billion dollars into the nation's banking system to create the liquidity it was

believed the banks needed in order to get back to the business of lending.[57]  A number of

programs were created to achieve this goal, the largest of which was the Capital Purchase

Program in which the Secretary of the Treasury initially allocated $205 billion for the purpose of

purchasing preferred stock and subordinated debentures from 623 financial institutions,[58]

including Wells Fargo.[59]

   A considerably smaller program established under TARP was intended to implement the

Economic Stabilization Act's objective to "help families keep their homes and to stabilize

communities." 12 U.S.C. § 5212(3). HAMP is part of this initiative.[60]

---

[55]  *See* Pub. L. No. 11-0343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201, *et seq.*).

[56]  *Markle v. HSBC Mortg. Corp. (USA)*, 2011 WL 6944911, at *1 (D. Mass. July 12, 2011) (identifying TARP as the "centerpiece" of the Emergency Economic Stabilization Act, 12 U.S.C. §§ 5201, 5211-5241).

[57]  WEBEL, *supra* note 55, at Summary.

[58]  U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-09-658, TROUBLED ASSET RELIEF PROGRAM: JUNE 2009 STATUS OF EFFORTS TO ADDRESS TRANSPARENCY AND ACCOUNTABILITY ISSUES 15 (2009), *available at* http://www.gao.gov/new.items/d09658.pdf (last visited July 19, 2012) [hereinafter GAO TARP Report].

[59]  News Release, Wells Fargo, Wells Fargo Issues Shares in U.S. Treasury Capital Purchase (Oct. 28, 2008), https://www.wellsfargo.com/press/2008/20081029_TARP (last visited July 19, 2012). Additional high-profile programs included the AIG bailout ($68 billion) and the Auto Industry Financing Program ($80 billion). GAO TARP Report, *supra* note 58, at 15.

[60]  Of the $46 billion allocated to housing support under TARP, as of May 2012 less than $4 billion has actually been spent. WEBEL, *supra* note 55, at Table 1.

24

*Bourdelais v. J.P. Morgan Chase*, 2011 WL 1306311 (E.D. Va. 2011), offers a good

description of HAMP:

> HAMP aims to prevent avoidable home foreclosures by encouraging loan
> servicers to reduce the required monthly mortgage payments for struggling
> homeowners. Specifically, HAMP enables certain homeowners who are in default
> or at imminent risk of default to obtain "permanent" loan modifications, by which
> their monthly mortgage payments are reduced to not more than thirty-one percent
> of their monthly income for a period of at least five years. Loan servicers receive
> from the government a $1,000 incentive payment for each permanent HAMP
> modification they offer.

*Id.* at *1. "Although participation in HAMP is required for government-sponsored entities

("GSEs") such as Fannie Mae and Freddie Mac, HAMP participation is voluntary for

non-GSEs." *Id.* Non-GSE servicers may elect to participate in HAMP to receive incentive

payments for successful loan modifications. *Id*

There are three basic permutations of loan ownership and servicing which give rise to a

bank's participation in HAMP. First, a bank may service a loan owned by Fannie Mae or Freddie

Mac. The relationship between Fannie Mae and the servicing bank is governed by a Mortgage

Selling and Servicing Contract ("Fannie Mae Contract"). *See Markle*, 2011 WL 6944911 at *1-2

& nn. 4-6. The relationship between Freddie Mac and the servicing bank is governed by the

Freddie Mac Single-Family Seller/Servicer Guide ("Freddie Mac Contract").[61]  With respect to

the Fannie Mae Contract, a Selling Guide ("Fannie Mae Selling Guide") and a Servicing Guide

("Fannie Mae Servicing Guide") are incorporated by reference. *Markle*, 2011 WL 6944911, at

*1-2 & nn. 5-6. The Fannie Mae Servicing Guide sets forth the HAMP guidelines which

automatically bind each servicer of a Fannie loan. *See* Fannie Mae Servicing Guide, Pt. VII, §

---

[61]  *See* Freddie Mac Single-Family Seller/Servicer Guide, *available at* http://www.freddiemac.
com/sell/guide/ (last visited July 19, 2012).

609 (2010). With respect to the Freddie Mac Contract, volume 1 of that contract details the

selling requirements while volume 2 details the servicing requirements. The mandatory HAMP

guidelines are set forth in volume 2. *See* Freddie Mac Contract, Vol. II, ch. C65.

The second permutation of loan ownership which could give rise to HAMP participation

is where a bank services a loan owned by third-party investors or mortgage banks. In this

situation HAMP regulations apply so long as the bank has voluntarily entered into a

Commitment to Purchase Financial Instrument and Servicer Participation Agreement ("SPA")

with Fannie Mae, by which Fannie Mae agrees to purchase a certain financial instrument[62] from

the bank in exchange for the bank's agreeing, among other things, to perform consumer

mortgage loan modifications. *See Bourdelais*, 2011 WL 1306311, at *1. The SPA expressly

incorporates the Treasury's Program Documentation, including the Treasury's HAMP

guidelines, procedures and supplemental directives.

Finally, a bank may service a loan which it owns itself. This too would give rise to

HAMP regulations if the bank chooses to enter into an SPA with Fannie Mae.

The requirements set forth for a servicing bank differ depending upon whether the owner

of the loan is a GSE (Fannie or Freddie), a third party, or the servicing bank itself. HAMP

guidelines for GSE loan servicers are included in the Servicing Guide for Fannie loans and in

volume 2 of the Freddie Mac Contract for Freddie loans. HAMP guidelines for non-Fannie and

---

[62]   Pursuant to Fed. R. Evid. 201(b)(2), I take judicial notice of the SPA standard template
contract available through the Home Affordable Modification Program website
(www.hmpadmin.com), a website administered by Fannie Mae as agent of the United States in
conjunction with the MakingHomeAffordable.gov website, an official program of the
Departments of the Treasury & Housing and Urban Development. This template SPA may be
found at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicer
participationagreement.pdf.

Freddie loan servicers are included in the HAMP handbook, guidelines, procedures, and

supplemental directives issued by the U.S. Treasury, which are incorporated into the SPA.

Recognizing the reality that, with respect to a bank servicing loans owned by private investors or

owners, such bank's investors or owners may have the right, under their contracts or existing

law, to restrict the bank from completing a loan modification, the SPA directs such bank to take

the following steps in modifying home loans:

> Fannie Mae acknowledges that Servicer may service mortgage loans for its own
> account or for the account of one or more Investors and may be subject to
> restrictions set forth in pooling and servicing agreements or other servicing
> contracts governing Servicer's servicing of a mortgage loan; Servicer shall use
> *reasonable efforts* to remove all prohibitions or impediments to its authority, and
> use reasonable efforts to obtain all third party consents, waivers and delegations
> that are required, by contract or law, in order to perform the Services.

(Emphasis added). Servicers of loans held by Fannie and Freddie, on the other hand, are *required*

by their respective contracts to complete the HAMP steps toward extending loan modifications

to eligible borrowers. *See Citimortgage, Inc. v. Carpenter*, 2012 WL 1079807 (Ohio App. 2 Dist.

March 30, 2012). Similarly, servicers of loans owned by the servicing bank itself which enter

into SPAs are subject to HAMP guidelines without the safe harbor for banks that require

third-party consent to perform certain services under the SPAs.

It is unclear from the Mitchells' complaint and supporting documents whether Wells

Fargo's participation in HAMP arises from a GSE selling and servicing contract or from an SPA.

Early in the adversary proceeding, the Mitchells asked the court to take judicial notice of an

amended SPA, implying that their loan was a non-GSE loan. But in their "Statement of Material

Facts as to Which There is Genuine Issue to be Tried" the Mitchells stated that Freddie Mac was

the beneficial owner of their loan at the time of the August 20, 2010 foreclosure sale which

27

would mean that the relevant contractual framework involved not an SPA between Wells Fargo

and Fannie Mae but a Freddie Mac Contract between Wells Fargo and Freddie Mac. As will be

discussed in parts b. and c. below, regardless of the contract by which Wells Fargo's HAMP

obligations arise, the results are the same.

Turning to the Mitchells' claim at issue, they argue that they are entitled to enforce the

relevant HAMP provisions as third-party beneficiaries of the SPA between Fannie and Wells

Fargo or as third-party beneficiaries of the Freddie Mac Contract, of which Freddie and Wells

Fargo are signatories. In this regard, the Mitchells urge me to rely on the rationale set forth in

*Marques* (discussed below). Wells Fargo proposes that I follow the majority of courts[63] and find

that the Mitchells are not third-party beneficiaries and are thus not entitled to enforce the HAMP

provisions inherent in the contract with Wells Fargo.

### iii.  Governing Law

In determining whether a party is an intended beneficiary entitled to enforce a contract to

which it is not a signatory, under either Massachusetts law or federal law, the Restatement

(Second) of Contracts provides the operative framework:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a
> promise is an intended beneficiary if recognition of a right to performance in the
> beneficiary is appropriate to effectuate the intention of the parties and either (a)
> the performance of the promise will satisfy an obligation of the promisee to pay
> money to the beneficiary; or (b) the circumstances indicate that the promisee
> intends to give the beneficiary the benefit of the promised performance . . . . An
> incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Markle*, 2011 WL 6944911, at *4-5 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 302

---

[63]  *See, e.g.*, *Cade v. BAC Home Loans Serv., LP*, 2011 WL 2470733, at *2 (S.D. Tex. June 20,
2011) (collecting cases in HAMP context); *Edwards v. Aurora Loan Serv., LLC*, 791 F. Supp. 2d
144, 152 (D.D.C. 2011) (same).

(1981)). The intent of the contracting parties is the critical inquiry: "[A] court may assess the parties' intent by inquiring into the reasonableness of the putative beneficiary's reliance on the intent manifested in the promise." *Markle*, 2011 WL 6944911, at *5. However, the analysis is further narrowed when a government contract is at issue. "Absent clear intent to the contrary, public citizens who benefit from a government contract are presumed to be incidental beneficiaries. . . . And conferral of third-party beneficiary status on a nonparty to a government contract must be consistent with the terms of the contract and the policy underlying it." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 313(2)); *see also Klamath, Dewakuku v. Martinez*, 271 F.3d 1031 (Fed. Cir. 2001).

The U.S. Supreme Court recently provided guidance as to the scope of third party beneficiary rights in the context of government contracts. In *Astra v. Santa Clara County*, 131 S.Ct. 1342, 179 L.Ed.2d 457 (Mar. 29, 2011), the Court considered the standing of county and county-operated medical facilities to bring actions against pharmaceutical manufacturers for allegedly overcharging the facilities for certain drugs in violation of an independent contract between the pharmaceutical manufactures and the federal government. In reversing the judgment of the lower court, the Supreme Court held that the plaintiffs were not intended beneficiaries of the contract and therefore had no standing to bring the suit.

On the basis that the statute did not provide a private right of action to the county-operated medical facilities, the Court held that Congress did not intend that third parties would be entitled to bring independent lawsuits to enforce the provisions of the government contract. To permit the facilities to bring claims as third-party beneficiaries would enable these facilities to make an end-run around the statute. *See id.* at 1348.

The Court bolstered its finding with three supporting reasons for denying the claimants third-party beneficiary status. First, the relevant statute prohibited the federal agency, the Department of Health and Human Services ("HHS"), from disclosing pricing information "that could reveal the prices a manufacturer charges for its drugs," thereby barring any potential suitor from obtaining the information necessary to assert alleged rights. *Id.* at 1349. Second, Congress established a formal dispute resolution procedure in light of published reports that HRSA "lacks the oversight mechanisms and authority to ensure that [covered] entities pay at or below the . . . ceiling price." *Id.* at 1349-50 (modifications in original). Third, the policy behind the contract between the pharmaceutical companies and the federal government was to centralize the procedures of two independent programs and "[r]ecognizing the County's right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits by 340B entitles [which cover county and county-operated medical facilities]." *Id.* at 1349.

The *Astra* decision stands for the proposition that third-party beneficiary status in relation to a government contract is determined on a case-by-case basis where the plaintiff bears the burden of showing two things: first, that the intent of the contracting parties was to bestow rights upon certain beneficiaries; and second, that this conclusion is consistent with the policy underlying the relevant government contract. The Mitchells thus bear the burden of showing that Wells Fargo and Fannie or Freddie, whichever entity was in privity with Wells Fargo, intended to give the Mitchells the legal benefit of the contract and that this conclusion aligns with the policy underlying the Freddie Mac Contract or the SPA, whichever is applicable.

### b. First Alternative Analysis—The Servicer Participation Agreement

In the event that an entity other than Freddie Mac owned the Mitchells' loan, an SPA would govern Wells Fargo's HAMP obligations.

The paramount purpose of the Emergency Economic Stabilization Act, which includes TARP, from which the Secretary of the Treasury derived the authority to establish HAMP, was to "immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States." 12 U.S.C. § 5201(1). A secondary goal of the Act was "to ensure that such authority and such facilities are used in a manner that (A) protects home values, college funds, retirement accounts, and life savings; (B) preserves homeownership and promotes jobs and economic growth; (C) maximizes overall returns to the taxpayers of the United States; and (D) provides public accountability for the exercise of such authority." *Id.* at § 5201(2).

One vehicle for injecting liquidity and stability into the banking system was for the government to purchase from banks financial instruments pursuant to SPAs. While the bank's agreement to perform loan modifications is certainly an important aspect of the SPAs, indeed it is a condition precedent to the government's obligation to purchase the financial instrument, it is but one of many conditions imposed upon the banks and is thus ancillary to the primary purpose of the agreement.

Of the published decisions dealing with the third-party beneficiary question I am aware of only two in which courts have granted third-party beneficiary status to borrowers: *Marques v. Wells Fargo Home Mortgage, Inc.*, 2010 WL 3212131 (S.D. Cal. Aug. 12, 2010), and *Parker v. Bank of America*, 2011 WL 6413615 (Mass. Super. Dec. 16, 2011).

31

In *Marques*, 2010 WL 3212131, the court denied the defendant's motion to dismiss and permitted the borrower-plaintiffs to pursue their claims as potential third-party beneficiaries of the SPA between Wells Fargo and Fannie Mae. The court held, first, that "[r]eading the [SPA] in its entirety evinces a clear intent to directly benefit eligible borrowers." *Marques*, 2010 WL 3212131, at *4. Pointing to the language in the SPA, the court identified certain actions required of the servicer with respect to a prospective loan modification:

> The Agreement expressly provides, "Servicer *shall* perform the loan modification and other foreclosure prevention services (collectively, the ' *Services'* ) described in" other documentation, including Program Guidelines. (Agreement ¶ 1(A) (italicized emphasis added.) Furthermore,
>
>> Servicer *shall* perform the Services for *all* mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an *"Investor"* ). Servicer *shall* use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consensus and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.
>
> ( *Id.* ¶ 2(A) (italicized emphases added); *see also id.* Ex. A ("Financial Instrument") ¶ 5(b))

*Id.* at *5. According to the *Marques* court, "the Agreement unambiguously directs Defendant to modify loans, identifies criteria to determine which loans are eligible for modification, and specifies how to modify them." *Id.* at *6.

In *Parker*, 2011 WL 6413615, the Massachusetts superior court conferred third-party beneficiary status on certain borrowers. The holding rests on three observations. First, "[i]t seems undeniable that the performance required of servicers who entered into SPAs was intended for the direct benefit of borrowers struggling to pay first mortgages on their residences, with the hope of additional but incidental benefits accruing to the economy as a whole." *Id.* at *8. Second,

32

> [n]either the enabling legislation nor the HAMP guidelines, nor the SPA provides any internal or external mechanism for adjudicating disputes over whether the servicer has complied with its obligations to solicit borrowers for HAMP participation, take timely action on their requests for loan modification, provide relief if they qualify, and stay foreclosure activity in the meantime.

*Id.* at *9. "In short: there is no risk of a judicial proceeding such as this one duplicating or undermining a parallel administrative enforcement system, because no such system exists." *Id.*

Third, borrowers "have no other forum in which their claims may be heard and adjudicated." *Id.*

I am not persuaded by the reasoning in *Marques* or *Parker*. First, while it is true that the SPA is intended to benefit homeowners, it does not necessarily follow that the parties to the SPA intended to bestow legal rights upon homeowners. Judge Saylor made this observation in *Markle*:

> Plaintiffs are undoubtedly correct that they are within the class of individuals that Congress and the Treasury Department intended to benefit by enacting the [Emergency Economic Stabilization Act] and creating HAMP. But they overlook the important difference between an intent to benefit borrowers and an intent to confer upon borrowers a right to enforce servicers' HAMP obligations.

2011 WL 6944911, at *6. Second, the primary policy underlying the Economic Stabilization Act and the SPAs arising as a result thereof, to inject liquidity into the banking system, is inconsistent with bestowing third-party beneficiary status on homeowners. Affording borrowers third-party beneficiary status would flood courts with HAMP claims and likely undermine the very purpose for which the Emergency Economic Stabilization Act was intended. As noted in *Markle*:

> If plaintiffs were third-party beneficiaries, every homeowner-borrower in the United States who has defaulted on mortgage payments or is at risk of default could become a potential plaintiff. Finding such a broad and indefinite a class of third-party beneficiaries would be inconsistent with the clear intent standard for government contracts set by the Restatement.

2011 WL 6944911, at *6. Furthermore, in the case of a typical non-GSE loan servicer, it is the

owner or investor, not the servicer bank, who has the final word on whether to modify a loan.

I conclude, therefore, that the SPA does not include borrowers as intended beneficiaries. While HAMP is a program intended to benefit eligible borrows, it is not one that creates rights in those borrowers vis-a-vis the agreements between third parties such as Wells Fargo and Fannie Mae. Thus, the presumption disfavoring the recognition of third-party beneficiaries in government contracts has not been overcome with respect to SPAs and the Mitchells should not be entitled to proceed as third-party beneficiaries under any SPA between Fannie Mae and Wells Fargo.

### c. Second Alternative Analysis—The Freddie Mac Single-Family Seller/Servicer Guide

Assuming that the Mitchells' loan was owned by Freddie Mac prior to the foreclosure sale date, then instead of an SPA, Wells Fargo's HAMP obligations would arise pursuant to the Freddie Mac Contract, a standard contract between Freddie Mac and the servicing bank. *See* Guide § 50.2; *Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1404 (N.D. Ala. 1997) ("As its title suggests, the Guide is a contract between [Freddie Mac] and each entity that sells mortgages to or services mortgages for [Freddie Mac].").

The HAMP guidelines are merely a component of the Freddie Mac Contract and thus the Mitchells would bear the burden of showing that they are intended beneficiaries of the contract as a whole and not solely the HAMP guidelines. The court in *Wells Fargo Bank, N.A. v. Sinnott*, 2009 WL 3157380 (D.Vt. 2009), considered whether the plaintiffs before it were third-party beneficiaries of a Freddie Mac Contract and concluded they were not:

> The terms of the Servicer Guide make clear that it exists not for the benefit of defaulting borrowers but rather to protect Freddie Mac's interests in its loans

34

which are serviced by other financial institutions. Section 51.1 of the Guide states
that "[t]he Servicer is responsible to act in the most timely, efficient and
responsible manner to protect Freddie Mac's interests." Further, Section 59.1 was
written to ensure payment of Escrow items, the non-payment of which could
result in first liens with priority over Freddie Mac's, and to require that such
payments are recovered from borrowers. There is simply no direct language in the
Guide to support the Sinnotts' contention that borrowers are intended third-party
beneficiaries to the Guide.

*Id.* at *11.

All courts to have considered the matter are in agreement that a Freddie Mac Contract

does not bestow upon third parties the right to enforce the contract: "The argument that a

mortgagor has third-party beneficiary status under the Servicer Guide has been uniformly

rejected by the federal courts." *Id.* (citing *Deerman*, 955 F. Supp. 1393, aff'd, 140 F.3d 1043

(11th Cir. 1998); *Thorien v. BARD Enters., LLC (In re Thorien)*, 2008 WL 5683488, at *8

(Bankr. D. Idaho Nov. 6, 2008); *Blair v. Source One Mortg. Servs. Corp.*, 1997 WL 732407, at

*2 (E.D. La. Nov. 20, 1997)). Although Freddie Mac servicers are required to modify certain

loans under the HAMP directives, which are included in volume 2 of the Freddie Mac Contract,

this requirement does not nullify the clear language in the preceding provisions of the same

contract. The Contract is intended to benefit Freddie Mac and its servicing banks alone.

Moreover, granting borrowers third-party beneficiary status under the Freddie Mac

Contract would again be incompatible with the overarching policy of the Emergency Economic

Stabilization Act which is the source for the HAMP program. Therefore, even if Wells Fargo's

HAMP obligations derive from a Freddie Mac Contract, the Mitchells are not third-party

beneficiaries and should not be entitled to enforce the HAMP provisions contained within that

contract.

35

### 5.  Recommendation as to Count I

For all the foregoing reasons, I recommend that Wells Fargo be granted summary judgment on each claim brought by the Mitchells under count I of their complaint subject to further consideration of the Mitchells' request to amend count I to include a trial period plan breach of contract claim after Wells Fargo has been given the opportunity to be heard on this request.

### D.  Count II—Power to Foreclose

The Mitchells allege in count II of their complaint that Wells Fargo had no power to foreclose the mortgage on their home because first, MERS lacked the authority to assign the mortgage to Wells Fargo, and second, even if it had the authority, the assignment was invalid because it was improperly executed.

As to the Mitchells' first argument, Wells Fargo, in its reply brief to the Mitchells' opposition to Wells Fargo's motion for summary judgment, points out that MERS was likely the only entity with the authority to assign the mortgage to a third party. At the inception of their loan from Superior Mortgage Corp. in 2007, the Mitchells granted a mortgage directly to MERS, which took the mortgage "solely as a nominee for [Superior] and [Superior's] successors and assigns." A nominee "is a 'person designated to act in place of another, usu[ally] in a very limited way' or a 'party who hold[s] bare legal title for the benefit of others.'" *Kiah v. Aurora Loan Servs., LLC*, 2011 WL 841282, at *8 (D. Mass. Mar. 4, 2011). "Massachusetts courts adhere to the principle that MERS may both foreclose and assign mortgages held in its name." *Mack v. Wells Fargo Bank, N.A.*, 2011 WL 4837261, at *4 (Mass. Super. Aug. 31, 2011) (quoting *In re Marron*, 455 B.R. 1, 4 (Bankr. D. Mass. 2011), and cases cited). As nominee for

36

Superior Mortgage Corp., MERS had the authority to assign the mortgage to a third party, Wells

Fargo in this case, on behalf of the beneficial owner, Superior Mortgage Corp. and its

"successors and assigns." *See Kiah*, 2011 WL 841282 at *8.

The Mitchells' second argument is that Wells Fargo lacked the power to foreclose the

mortgage on their property because the assignment from MERS to Wells Fargo was invalid. As

grounds, the Mitchells state that Andrew Harmon acted as both a MERS Vice President in

assigning the mortgage and as Wells Fargo's foreclosing attorney and that he did not have the

express authority from the beneficial holder of the note to assign the mortgage.

The validity of mortgage assignments from MERS was the subject of my decision in *In

re Marron*, 455 B.R 1, which held that an assignment from MERS that was executed before a

notary public by a person purporting to be an officer of MERS was valid and enforceable against

MERS in accordance with Mass. Gen. Laws ch. 183, § 54B. Under Massachusetts law, an

assignment of a mortgage is effective without the need to independently establish the authority of

the assignor to make the assignment. *In re Marron*, 455 B.R. at 8 (citing *Aliberti v. GMAC

Mortg., LLC*, 2011 WL 1595442, at *6 (D. Mass. April 28, 2011); *Kiah*, 2011 WL 841282 at *7.

In addition to the fact that the Mitchells and Wells Fargo both offered the assignment of

the mortgage from MERS to Wells Fargo as an exhibit for consideration, I may take judicial

notice of the assignment as a public record. Fed. R. Evid. 201(b); *see also McKenna*, 2011 WL

1100160 at *1 n.6. The document reflects that on July 29, 2009 Andrew Harmon, in his capacity

as Assistant Secretary and Vice President for MERS, personally appeared before Gregory

McCarthy, a notary public commissioned by the Commonwealth of Massachusetts, and executed

the assignment. As the assignment from MERS to Wells Fargo was executed before a notary

public by a person purporting to be an officer of MERS, the Mitchells are bound by MASS. GEN. LAWS ch. 183, § 54B and may not attack the validity of the assignment.

Therefore, as to count II, I recommend that Wells Fargo be granted summary judgment as a matter of law.

### E.  Counts III and IV—Unfair or Deceptive Act or Practice and Attorney's Fees

The Mitchells allege in count III that Wells Fargo violated MASS. GEN. LAWS ch. 93A ("Chapter 93A") in conducting a foreclosure sale while simultaneously leading the Mitchells to believe that they would be granted loss mitigation relief. Count IV seeks attorney's fees for the alleged Chapter 93A violation. In its defense, Wells Fargo raises the Mitchells' failure to send a demand letter pursuant to Chapter 93A, § 9(3).[64]

---

[64]  Chapter 93A, § 9(3) provides:

> At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or

In consumer transactions such as the one involved in this case, Chapter 93A requires that

an individual serve a potential defendant with a written demand for relief at least thirty days prior

to the filing of any action. Mass. Gen. Laws ch. 93A, § 9(3). "The purpose of a [Chapter] 93A

demand letter is to encourage negotiation and settlement of claims arising from allegedly

unlawful conduct and to allow the defendant to limit the damages a plaintiff might recover by

making a reasonable offer of settlement." *Moynihan v. LifeCare Ctrs. of Am., Inc.*, 2003 WL

22717633, at *1 (Mass. App. Ct. 2003). Limited exceptions to the demand letter requirement are

contained in Chapter 93A, including the provision that a demand letter is not required "if the

claim is asserted by way of counterclaim or cross-claim, or *if the prospective respondent does*

*not maintain a place of business or does not keep assets within the commonwealth*." Mass. Gen.

Laws ch. 93A, § 9(3) (emphasis added).

The Mitchells claim an exemption from the demand letter requirement because they

assert that Wells Fargo neither maintains a place of business nor keeps assets in Massachusetts.[65]

Citing *Paisley v. GMAC Mortgage, LLC*, 2011 WL 1663092 (Mass. Super. Feb. 25, 2011), the

Mitchells go even further, however, and argue that in the highlighted language above the word

"or" is disjunctive so that § 9(3) provides alternative grounds for an exemption from the demand

cross-claim, or if the prospective respondent does not maintain a place of business
or does not keep assets within the commonwealth, but such respondent may
otherwise employ the provisions of this section by making a written offer of relief
and paying the rejected tender into court as soon as practicable after receiving
notice of an action commenced under this section. Notwithstanding any other
provision to the contrary, if the court finds any method, act or practice unlawful
with regard to any security or any contract of sale of a commodity for future
delivery as defined in section two, and if the court finds for the petitioner,
recovery shall be in the amount of actual damages.

[65] Mitchell' Opposition to Wells Fargo's Motion for Summary Judgment, Docket No. 78, p.12.

letter requirement. It is the Mitchells' position that if Wells Fargo either does not have a place of
business in Massachusetts or does not have assets in the Commonwealth. a demand letter is not
required.

Wells Fargo responds by arguing first that it has assets in the Commonwealth, namely
ownership of the Mitchells' mortgage, and second that the word "or" in § 9(3) is used in the
conjunctive, alleviating the demand letter requirement only if the prospective defendant has
*neither* a place of business nor assets in the Commonwealth. In support of its position Wells
Fargo relies on *Okoye v. Bank of N.Y. Mellon*, 2011 WL 3269686 (D. Mass. July 28, 2011). In
*Okoye*, the court found, even though the defendant bank did not maintain a place of business in
Massachusetts, that because the defendant bank held "at least one mortgage in the
Commonwealth," the plaintiffs were required to send the bank a demand letter. The court relied
upon *Anderson v. Ameriquest Mortg. Co.*, 2006 WL 2786974, at *1 (Bankr. D. Mass. Sept. 26,
2006), for the proposition that a mortgage secured by real property located in the Commonwealth
qualifies as an asset in Massachusetts for purposes of the Chapter 93A demand letter requirement
("Given that the mortgage at issue herein is recorded in the Commonwealth and that the security
for the mortgage, which gives the mortgage its value, is located in the Commonwealth, there is at
least one asset located here in Massachusetts."). *See also Arazi v. Saxon Mortg. Servs., Inc.*, 2011
WL 5519914, at *2 (D. Mass. Nov. 14, 2011).

I believe the more sensible and natural reading of § 9(3) is to interpret the word "or" as
conjunctive rather than disjunctive. Doing business in a jurisdiction or owning assets are two of
the hallmarks of the minimal contacts theory of personal jurisdiction, *see Int'l Shoe Co. v. State
of Wash.*, 326 U.S. 310, 316 (1945), which led to the enactment of long-arm statutes such as

MASS. GEN. LAWS ch. 223A. *See* Harold Brown, *A Long-Arm Statute for Massachusetts*, 74

COM. L.J. 198, 202 (1969). Under the Massachusetts long-arm statute, MASS. GEN. LAWS ch.

223A, § 3, the existence of any one of a list of eight enumerated criteria with respect to a

person,[66] including transacting any business or having an interest in, using or possessing real

property in the Commonwealth, confers upon a court personal jurisdiction over such person. The

only logical way to understand Chapter 93A's demand letter exception is that it is intended to

exclude a class of potential defendants who lack minimal contacts with Massachusetts. Viewed

from this perspective, the demand letter exception should apply only to those who have no

contact with Massachusetts, in other words those who neither do business nor own assets in the

Commonwealth.

I recommend adopting the reasoning in *Okoye* and holding that a consumer is exempt

from sending a Chapter 93A demand letter only if the respondent neither maintains a place of

business nor keeps assets in the Commonwealth. Wells Fargo held the Mitchell's mortgage from

July 29, 2009, the date of the assignment from MERS, through at least August 20, 2010, the

foreclosure date, and then purchased the property at the foreclosure sale. Thus, Wells Fargo held,

and continues to hold, at least one asset in the Commonwealth[67] and the Mitchells do not qualify

for exemption from the demand letter requirement under Chapter 93A § 9(3).

---

[66] A "person" is defined under MASS. GEN. LAWS ch. 223A, § 1 as "an individual, his executor,
administrator or other personal representative, or a corporation, partnership, association or any
other legal or commercial entity, whether or not a citizen or domiciliary of this commonwealth
and whether or not organized under the laws of this commonwealth."

[67] Wells Fargo and the Mitchells entered into a stipulation to continue the temporary restraining
order which enjoined Wells Fargo from alienating the Mitchells' 279 Saunders Street property or
taking any action to evict or otherwise dispossess the Mitchells from the residency of their
property. In return, the Mitchells agreed to make regular monthly payments of $1,330.14. The
stipulation was approved on June 2, 2010 [Docket No. 18] and remains in effect.

As a secondary argument for why they should be exempt from the demand letter requirement, the Mitchells contend that the extraordinary circumstances of their case justify a waiver of the requirement. Emphasizing the spirit of Chapter 93A, the Mitchells argue:

> [T]he Massachusetts legislature probably did not have in mind a situation like the one facing the Plaintiffs on August 24, 2010, when they commenced this case. The plaintiffs needed a temporary restraining order to prevent the buyer at the putative foreclosure sale from alienating their home to a bona fide purchaser, against whom they would have many fewer defenses. But they could not obtain a TRO without having an active court case, and that required drafting and filing a complaint *immediately*, not 30 days later. The Plaintiffs are unaware of any Massachusetts case holding that a prospective 93A claimant must risk irreparable harm by sending a demand in advance of a suit seeking primarily injunctive relief.[68]

At least one other court has addressed the issue of whether equitable considerations could justify departing from the express provisions of Chapter 93A, § 9(3). In *McKensi v. Bank of America, N.A.*, 2010 WL 3781841, at *3 (D. Mass. 2010), the plaintiffs commenced an action against Bank of America five days after sending a Chapter 93A demand letter. The plaintiff in *McKensi* filed suit in order to seek a temporary restraining order to halt an impending foreclosure sale. The court in *McKensi* observed that "the Bank has cited no cases and none have been found where the premature filing of a complaint constitutes a waiver of a plaintiff's right to assert a [Chapter] 93A action." *Id.* at *3. Noting that the bank had "ample opportunity" to evaluate Mr. McKensi's demand and propose a settlement after the complaint was filed, the court held that the timing of the suit did not justify dismissing the Chapter 93A claim.

But, even in McKensi a demand letter was sent. The Mitchells never sent a Chapter 93A demand letter to Wells Fargo. "The statutory notice requirement [of a Chapter 93A, § 9 demand letter] is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'" *Rodi v. S. New*

---

[68] Mitchells' Opposition to Wells Fargo's Motion for Summary Judgment, Docket No. 78, p.12.

*England Sch. of Law*, 389 F.3d 5, 19 (1st Cir. 2004); *In re Lacey*, 2012 WL 2872050, at *28

(Bankr. D. Mass. July 12, 2012). The demand letter requirement is jurisdictional and the failure

to send one when one is necessary requires dismissal of the suit. *City of Bos. v. Aetna Life Ins.*

*Co.*, 399 Mass. 569, 574, 506 N.E.2d 106, 109 (1987) ("The failure of the City to allege the

sending of a demand letter is fatal to its § 9 claim.").

      The Mitchells were not prevented from instituting suit against Wells Fargo immediately

after learning of the foreclosure sale of their home in order, among other things, to seek

injunctive relief to maintain the status quo until a final adjudication of the merits of their claims.

They merely lacked the right to include in their complaint a cause of action under Chapter 93A.

They could have sent a demand letter at any time and then amended their complaint to add a

Chapter 93A count if Wells Fargo did not respond appropriately to the demand letter. *See*

*Irizzary v. Stonebriar Dev. Corp.*, 1989 Mass. App. Div. 149, 150 (1989) (holding that the

pre-suit demand requirement is satisfied if the Chapter 93A letter is sent after the filing of an

initial common law complaint and then the complaint is later amended to include the Chapter

93A count after the expiration of thirty days and noting that "[n]egotiations and settlement may

be goals of the statute, but its primary goal is to protect consumers and to grant them rights and

remedies for unfair practices."); *see also Rodi*, 389 F.3d at 20.

      Having put the cart before the horse, the Mitchells cannot now proceed with counts III

and IV of their complaint. However, when a claim under Chapter 93A is brought without proper

compliance with the demand letter requirement, the appropriate action is dismissal without

prejudice in order to enable the plaintiff to refile a complaint if appropriate after compliance with

the statutory prerequisites. *See* MICHAEL G. GILLERAN, 52 MASSACHUSETTS PRACTICE SERIES:

THE LAW OF CHAPTER 93A § 7.6 (2d ed. 2007 & Supp. 2011).

I, therefore, recommend that granting Wells Fargo summary judgment as to counts III and IV of the complaint be without prejudice to the Mitchells' ability to seek to amend their complaint or file a new one upon complying with the demand letter requirements of Chapter 93A, § 9(3).

**V. Conclusion**

For the aforementioned reasons, I recommend that Wells Fargo's motion for summary judgment be granted as to counts I, II, III, and IV of the complaint. However, the Mitchells have requested that the complaint be amended to include a trial period plan breach of contract claim and I would recommend entertaining such a request after affording Wells Fargo an opportunity to respond to it. Finally, I recommend that summary judgment as to counts III and IV be without prejudice to the Mitchells' right to seek to amend the complaint to add these counts or to file a new complaint upon complying with MASS. GEN. LAWS ch. 93A, § 9(3).

At Worcester, Massachusetts this 20th day of July.

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   Walter Oney
Fitchburg, MA
For the Plaintiffs, Daniel and Sandra Mitchell

Peter J. Haley
Nelson Mullins
Boston, MA
For the Defendant, Wells Fargo Bank, N.A.

44